**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

────────────

Nos. 22-1591; 22-1872


THE BOARD OF TRUSTEES, in its capacity as trustees and
fiduciaries of the ILA PRSSA PENSION FUND,

Plaintiff, Appellee,

v.

ILA LOCAL 1740, AFL-CIO, an Unincorporated Labor Organization,

Defendant, Appellant,

JOHN DOES 1 THROUGH 10, inclusive,

Defendants.

────────────

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Silvia Carreño-Coll, U.S. District Judge]

────────────

Before

Montecalvo, Lipez, and Thompson,
Circuit Judges.

────────────

Carlos R. Paula, with whom Jaime E. Picó-Rodríguez and Labor
Counsels, LLC were on brief, for appellant.
Clarissa A. Kang, with whom Dylan D. Rudolph, Catherine L.
Reagan, Trucker Huss, APC, Enrique J. Mendoza Mendez, and Mendoza
Law Offices were on brief, for appellee.

August 22, 2024

**THOMPSON, <u>Circuit Judge</u>**.    The International Longshoremen's Association ("ILA") is the largest labor union of maritime workers in North America.  This appeal asks us to consider whether two of its Puerto Rico labor union affiliates, Appellant ILA Local 1740 ("Local 1740") and ILA Local 1575 ("Local 1575"), merged in August 2015 following their execution of a Merger Agreement.  Appellee, the Board of Trustees of the ILA PRSSA Pension Fund (the "Board") says yes, the merger happened and sued Local 1740, as the surviving ILA entity, for the collection of outstanding financial obligations it says Local 1575 owed to the ILA PRSSA Pension Fund (the "Pension Fund"), an ERISA pension benefit plan that the Board manages.  Responding to cross motions for summary judgment, the district court sided with the Board and awarded it damages and attorney's fees.  Now, before us, Local 1740 insists that the district court got it all wrong chiefly because it erroneously found that the merger occurred after incorrectly refusing to consider relevant extrinsic evidence, and after failing to find the record replete with genuine issues of disputed material fact relevant to the hotly contested merger controversy.  Writing just for the parties, we assume their familiarity with the facts, procedural history, and arguments presented -- which we reference only as needed to give the gist behind why we find ourselves affirming the judgment below for substantially the same reasons offered by the district judge.

### HOW WE GOT HERE[1]

In March 2015, a (metaphorical) storm was brewing at the Port of San Juan (the "Port") in San Juan, Puerto Rico. There, Horizon Lines, LLC ("Horizon"), a stevedoring company,[2] ceased its operations at the Port. At the time of the shutdown, Horizon was the exclusive employer of workers belonging to Local 1575. The result was bedlam: All Local 1575 members lost their jobs. And, in the wake of Horizon's departure another stevedoring company, Luis A. Ayala Colon Sucrs., Inc. ("Ayala"), expanded its operations and took over Horizon's former piers. Union strife ensued[3] because Local 1575 members believed they were contractually entitled to continue working their old docks. But Ayala already had existing contracts with other ILA chapters, specifically Locals 1901, 1902, and 1740, similarly operating at the Port. Seeking to calm the tempest and simplify the organizational structures, ILA -- pursuant to a provision within its Constitution -- decided to exercise its authority and merge the four ILA Locals operating at

---

[1] We draw the relevant facts presented herein from the parties' statements of undisputed facts.

[2] For the less initiated, stevedoring simply refers to the process of loading and unloading ships in port. <u>Stevedore</u>, Merriam-Webster, <u>https://www.merriam-webster.com/dictionary/stevedoring</u> (last visited August 6, 2024) [perma.cc/X9PV-T8L3].

[3] For example, Ayala filed National Labor Relations Board ("NLRB") charges against Local 1575 for "picketing the facilities of [Ayala], the Employer, and blocking all ingress and egress to and from the facilities of the Employer at its Piers E and F."

the Port into one consolidated local.  ILA made this decision after "finding that a merger [was] in the best interests of all the union members involved."  It then designated Local 1740 to be the last man standing.  Following that decision, authorized representatives of the four Locals executed a Merger Agreement that, by its terms, purportedly became effective August 1, 2015.

Of import to the dispute here is the Pension Fund, a multiemployer benefit plan established in 1973, and maintained under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), which provides pension, retirement, and other related benefits to its participants.  The Trust Agreement is administered by the Board and ERISA sets forth its fiduciary duties.  Those responsibilities include collecting liabilities owed to the Pension Fund from participating employers.  Local 1575, which prior to the merger had been a participating plan employer, owed the Pension Fund delinquent pension contributions as well as withdrawal liability payments[4] because of a mass withdrawal of

---

[4] Under ERISA, the federal statute regulating employee benefit plans, an employer that has assumed an obligation to contribute to and subsequently withdraws in whole or in part from a multiemployer pension plan is liable for its allocable share of any underfunding. See 29 U.S.C. § 1381.  The liability amount is calculated based on a formula set forth in 29 U.S.C. § 1381 entitled "Withdrawal liability established; criteria and definitions."

employers from the Pension Fund[5] following Horizon's cessation of operations at the Port.  Unlike Local 1575, Local 1740, the remaining ILA-merged entity at the Port, was not an employer to the Pension Fund at issue here.

After sending multiple notices and demands for payment to Local 1740, all of which went unanswered, the Board filed suit in August 2018 seeking to collect Local 1575's delinquent financial obligations to the Pension Fund from Local 1740, contending it had assumed Local 1575's liabilities when the unions merged and was therefore contractually liable for Local 1575's preexisting debt obligations.[6]  During the summary judgment proceedings below, Local 1740 advanced several arguments as to why it was not liable to the Pension Fund.  However, as most pertinent to our ensuing discussion, Local 1740 primarily argued that the merger between it and Local 1575 was never effectuated because the Merger Agreement contained several conditions precedent that Local 1575 had to fulfill to complete the merger, none of which had been done.

---

[5] Those withdrawing from the Pension Fund were Horizon Lines of Puerto Rico (due to Horizon shutting down its Port operations), ILA Local 1575 AFL-CIO, ILA New York AFL-CIO (ITF Inspector ILA), ILA-PRSSA Welfare Fund, and ILA-PRSSA Pension Fund.

[6] In its complaint, the Board filed two claims against all defendants: (1) withdrawal liability under ERISA § 4201, 29 U.S.C. § 1381; and (2) delinquent contributions under ERISA § 515, 29 U.S.C. § 1145.

The district court rejected the breadth of Local 1740's arguments and entered partial summary judgment for the Board on its liability claims.  See Bd. of Trs. v. ILA Loc. 1740, AFL-CIO, Civ. No. 18-1598, 2022 WL 2117771 (D.P.R. June 13, 2022).  Later, the court issued judgment in favor of the Board and awarded it: (1) $15,485.88 on its delinquent contribution claim; (2) $1,025,308.72 on its withdrawal liability claim; (3) $634,715.60 in attorney's fees; and (4) $5,215.79 in costs.  See Bd. of Trs. v. ILA Loc. 1740, AFL-CIO, Civ. No. 18-1598, 2022 WL 4591843 (D.P.R. Sept. 30, 2022).  Unpleased with those outcomes, Local 1740 appealed, and here we are.[7]

## DISCUSSION

### A.   Summary Judgment

Broadly, Local 1740 asks us to let it off the hook for Local 1575's delinquent contributions and withdrawal liability to the Pension Fund.  And in doing so, Local 1740 rehashes here the barrage of arguments it made below about why the Board was not entitled to summary judgment.

Our "careful de novo review . . . of the record [or abuse of discretion where applicable and as indicated], the parties' appellate submissions, and the applicable law," leaves us with no

---

[7]  Local 1740 first appealed the liability judgment and next appealed the award of damages.  We consolidated both for our review.

reason "to disturb the district court's decision, which is comprehensive and well-reasoned." J-Way S., Inc. v. United States Army Corps of Eng'rs, 34 F.4th 40, 42 (1st Cir. 2022) (citing N.R. by & through S.R. v. Raytheon Co., 24 F.4th 740, 746 (1st Cir. 2022)). As we've held "when lower courts have supportably found the facts, applied the appropriate legal standards, articulated their reasoning clearly, and reached a correct result, a reviewing court ought not to write at length to merely hear its own words resonate." deBenedictis v. Brady-Zell (In re Brady-Zell), 756 F.3d 69, 71 (1st Cir. 2014); see also Vargas-Ruiz v. Golden Arch Dev., Inc., 368 F.3d 1, 2 (1st Cir. 2004). Because this case fits that mold, we affirm by relying substantially on the basis of Judge Carreño-Coll's well-reasoned and thorough decision, adding only a few comments relevant to Local 1740's various arguments before us.[8]

We begin by observing, as the district court aptly explained, that the crux of the parties' dispute, and the issue to which nearly all of Local 1740's arguments redound, is whether

---

[8] "We review the district court's summary-judgment decision de novo, which, for those unfamiliar with Latin, simply means we give the decision a completely fresh look." Hamdallah v. CPC Carolina PR, LLC, 91 F.4th 1, 16 (1st Cir. 2024). In doing so, we "ask[] whether the summary-judgment winner[] (here, [the Board]) [is] entitled to judgment as a matter of law because there is no genuine dispute as to any material fact -- even after taking all facts and inferences in the light most flattering to the summary-judgment loser [here, Local 1740]." Delgado-Caraballo v. Hosp. Pavía Hato Rey, Inc., 889 F.3d 30, 34-35 (1st Cir. 2018) (internal citations and quotation marks omitted).

Local 1575 merged into Local 1740 pursuant to the Merger Agreement. See Bd. of Trs., 2022 WL 2117771, at *8. And to answer that question, we examine de novo whether the Merger Agreement contains conditions precedent that required Local 1575 to take certain steps to complete the merger.[9] In contending that no merger ever occurred, Local 1740 argues that the court erred because it incorrectly based its decision exclusively on the Merger Agreement. Instead, it contends that the court "should have considered all other competent evidence on the record of the case [s]howing what was the parties' intention when contracting and/or when signing the Merger Agreement." Had the court done so, Local 1740 continues, it would have concluded that the record was replete with genuine issues of material fact as to whether the Merger Agreement did indeed contain conditions precedent necessary to effectuate the merger, and it would have denied summary judgment.

        Color us unpersuaded. As an initial matter, Local 1740's pleas that we look to extrinsic evidence misunderstands our order

---

[9] Simply put, "[a] condition precedent is 'an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract.'" Am. Priv. Line Servs., Inc. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992) (quoting Mass. Mun. Wholesale Elec. Co. v. Danvers, 577 N.E.2d 283, 287 (Mass. 1991)). Local 1740 says that the Merger Agreement required that, prior to the merger being finalized and completed, Locals 1575, 1901, and 1902: (1) submit the signed Merger Agreement to ILA for approval; (2) turn their assets over to Local 1740; (3) surrender their charters to ILA; and (4) merge their respective membership lists.

of operations when it comes to contract interpretation. We explain. As we've previously indicated, contract interpretation is a question of law. See Greenpack of P.R., Inc. v. Am. President Lines, 684 F.3d 20, 26 (1st Cir. 2012). So we turn to a scrutiny of the contract being challenged and spell out the legal principles which inform our analysis. The Puerto Rico Civil Code, applicable to this dispute, provides, "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." P.R. Laws Ann. tit. 31, § 3471 (repealed in 2020 and replaced with P.R. Laws Ann. tit. 31, § 6342(b)).[10] Moreover, we've held that "to consider extrinsic evidence at all, the court must first find the relevant

---

[10] Although § 6342(b) has replaced §§ 3471-72, Local 1740 says we should look to §§ 3471-72 because these provisions prevailed at the time of the events in this case. Because those sections were in effect at the time of the events, and we have discovered no case law construing § 6342(b) differently, we will consider §§ 3471-72. Additionally, Local 1740 (and the district court) acknowledged that those sections are very similar to § 6342 and brief their respective positions under § 3471. The fact that Puerto Rico's parol evidence rule (which -- broadly speaking -- barred consideration of extrinsic evidence to an unambiguous contract) has been repealed does not impact our caselaw either because our "decisions [that] make it clear that [the Puerto Rico Civil Code provisions] preclude[] consideration of 'extrinsic evidence to vary the express, clear, and unambiguous terms of a contract'" "did not rely exclusively on the parol evidence rule." IOM Corp. v. Brown Forman Corp., 627 F.3d 440, 448 n.9 (1st Cir. 2010); see also Bd. of Trs., 2022 WL 2117771, at *8 n.6.

terms of the agreement unclear." Borschow Hosp. & Med. Supplies, Inc. v. César Castillo, Inc., 96 F.3d 10, 16 (1st Cir. 1996) (quoting Exec. Leasing Corp. v. Banco Popular de P.R., 48 F.3d 66, 69 (1st Cir. 1995)); In re Advanced Cellular Sys., Inc., 483 F.3d 7, 12 (1st Cir. 2007); see also IOM Corp. v. Brown Forman Corp., 627 F.3d 440, 447 (1st Cir. 2010). "If the court finds no ambiguity, it should proceed to interpret the contract — and it may do so at the summary judgment stage." Torres Vargas v. Santiago Cummings, 149 F.3d 29, 33 (1st Cir. 1998); see also Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 31 (1st Cir. 2012) (explaining that under Puerto Rico law, "[w]here the terms of a contract are clear, leaving no doubt as to the contracting parties' intentions, such contract will be observed according to 'the literal sense of its stipulations'" (quoting P.R. Laws Ann. tit. 31, § 3471)). We've noted that "[a]n agreement is clear when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation.'" In re Advanced Cellular Sys., Inc., 483 F.3d at 12 (quoting Catullo v. Metzner, 834 F.2d 1075, 1079 (1st Cir. 1987)); see also Almeida-León v. WM Cap. Mgmt., Inc., 993 F.3d 1, 12 (1st Cir. 2021). If, however, the court discerns any ambiguity, it must examine extrinsic evidence. See Torres Vargas, 149 F.3d at 33. However, that inquiry "does not automatically preclude brevis disposition." Id. Rather, "[s]ummary judgment may be appropriate

even if ambiguity lurks as long as the extrinsic evidence presented
to the court supports only one of the conflicting interpretations."
Id.

Turning to the district court's scrutiny of the Merger
Agreement, we observe it determined that three of the four
provisions to which Local 1740 takes exception were clear and
unambiguous (and we'll say more about the fourth momentarily).
See Bd. of Trs., 2022 WL 2117771, at *9-10.  Specifically, the
provisions requiring:  (1) the transfer of Local 1575's assets to
Local 1740; (2) the surrender of Local 1575's charter to ILA; and
(3) the merger of the respective membership lists.  See id.
Therefore, in rejecting Local 1740's argument that the three terms
were conditions precedent, the court found that nowhere in the
Merger Agreement was there any language expressly conditioning the
merger's actualization on the completion of these contract
provisions.  See id.; see also Vulcan Tools of P.R. v. Makita USA,
Inc., 23 F.3d 564, 567 (1st Cir. 1994) (explaining that we find
the terms of an agreement clear when they are "sufficiently lucid
to be understood to have one particular meaning, without room for
doubt" (quotation marks omitted)).  And because those terms
themselves were otherwise clear and pellucid in what the contract
called for by way of performance, Local 1740's plea to the court
for it to consider extrinsic evidence beyond the Merger Agreement
itself was of no help because the court needed no extratextual

evidence to ascertain the meaning of those terms.  See Bd. of Trs.,
2022 WL 2117771, at *9-10; see also Borschow Hosp. & Med. Supplies,
Inc., 96 F.3d at 15 (noting that courts may not use "extrinsic
evidence to vary the express, clear, and unambiguous terms of a
contract").

Upon our de novo review, we agree.  Yes, the Merger
Agreement does confer contractual obligations upon Local 1575 (and
the other Locals for that matter) to perform certain actions (which
in theory might give rise to breach of contract claims), but it
does not expressly condition the Locals' merger on the fulfillment
of those obligations.  Therefore, we see no error in the court's
determination.

Next, the court determined that one provision was
infected with ambiguity, to wit, whether Local 1575 (along with
Locals 1901 and 1902) was required to submit, but did not do so,
the signed Merger Agreement to ILA for its approval in order for
the merger to be effectuated.  Given the ambiguity it discerned,
the court turned to extrinsic evidence to suss out the parties'
intent as our case law so instructs.  See Bd. of Trs., 2022 WL
2117771, at *10 (citing Borschow Hosp. & Med. Supplies, 96 F.3d at
16).[11]  We add a few words to the district court's handling of the

_____

[11] Contrary to Local 1740's assertion that the district court
failed to consider extrinsic evidence when it concluded that the
term was indeed ambiguous, the record belies that assertion.  See
Bd. of Trs., 2022 WL 2117771, at *10.

one-out-of-four term in controversy.  As the district court noted,
although the Merger Agreement references approval generally in
several different sections of the contract, it neither specifies
whose approval is required, nor what approval entails.  See id.
Therefore, we agree with the district court's assessment that this
aspect of the Merger Agreement is unclear as to whether some type
of approval by ILA was intended to be a condition precedent to
merger because it cannot "be understood in one sense alone, without
leaving any room for doubt, controversies or difference of
interpretation."  Exec. Leasing Corp., 48 F.3d at 69 (citation
omitted).

      The district court then turned to its review of the
extrinsic record evidence, and in doing so, found it determinative
that Locals 1901 and 1902 unquestionably merged into Local 1740,
despite each Local's failure to submit a signed copy of the Merger
Agreement to ILA for its approval.  See Bd. of Trs., 2022 WL
2117771, at *10; see also U.S.I. Properties Corp. v. M.D. Const.
Co., 860 F.2d 1, 10 (1st Cir. 1988) ("Under Puerto Rico law, . . .
the acts of the parties, both contemporaneous with and subsequent
to the contract, are evidence relevant to the contract's
interpretation." (Emphasis added) (citing P.R. Laws Ann. tit. 31,
§§ 3471-72)).  While Local 1740 pointed to statements by two ILA
officials expressing their belief that the merger was conditioned
upon ILA approval by means of the Locals submitting a signed

agreement to it, the district court explained that this evidence
was unhelpful in advancing Local 1740's interpretation of the
Merger Agreement, as these are merely "statements explaining what
[those individuals] believe the contract itself required rather
than conduct demonstrating the parties' intent." Bd. of Trs.,
2022 WL 2117771, at *10. Therefore, the district court concluded
that the term was not a condition precedent because the extrinsic
evidence supporting such a determination was so one-sided that no
reasonable juror could find otherwise and accordingly, the
acknowledged ambiguity could not block summary judgment. See id.;
see also Torres Vargas, 149 F.3d at 33 ("Summary judgment may be
appropriate even if ambiguity lurks as long as the extrinsic
evidence presented to the court supports only one of the
conflicting interpretations."). And while Local 1740 contends
that a material issue of fact exists "as to whether [ILA] approved
the merger of Local 1575 and Local 1740, and as to whether the
merger became effective," and further contends that if the district
court had properly viewed "the controversial and competent
evidence" of record, it would have reached a different conclusion,
we disagree. Upon our de novo review of the record and of the
district court's persuasive reasoning, we see no error in the
court's legal finding that the merger was not contingent upon some
type of formal approval from ILA. That the other two Locals merged
into Local 1740 without such specific approval is a clear

demonstration of the parties' intent not to require such a formality, and while Local 1740 repeats on appeal that we should defer to a contrary interpretation endorsed by two ILA officials, we agree with the district court that these conclusory statements about how to read the contract do not undermine what the parties' actual conduct reveals about the meaning of the Merger Agreement.

Therefore, with the rejection of Local 1740's conditions precedent arguments, we, like the district court, conclude the Merger Agreement contains no such requirements and affirm that aspect of the court's ruling.[12]

Shifting gears to address the money issue in dispute, Local 1740 contends that even if the merger occurred, the pension and welfare benefit plans of each separate union was excluded from the merger and therefore the court erred when it concluded that because of the merger, Local 1740:  (1) assumed Local 1575's liabilities; and (2) must pay all Local 1575's delinquent contributions and withdrawal liability from the Pension Fund.  In so arguing, Local 1740 points to that part of the Merger Agreement which indicates that the Locals' respective labor-management trust

---

[12] Local 1740's standalone argument that in essence contends no merger occurred because Local 1575 complied with "not one aspect of the merger . . . as originally envisioned and intended with the Merger Agreement," because "Local 1575 seems to continue in existence as a legal entity since it still manages the trust funds (Pension Fund and Royalty Fund)," is basically a rehash of its no-merger-ever-occurred argument, which we've already rejected for reasons explained.

agreements which provides pension benefits to its members were to
remain unaltered and survive the merger.[13]  However, as the district
court noted, the provision Local 1740 cites to does not shield it
from liability since by the terms of the Merger Agreement itself,
another provision kicks in which is broad in scope; specifically,
Local 1740 expressly agreed to "assume all obligations of Local[]
1575."  See Bd. of Trs., 2022 WL 2117771, at *12.  Nor, says the
district court, are the two provisions in conflict.  See id.
Rather the Merger Agreement is best understood to provide only
that when all the Locals merged into Local 1740 the respective
benefit fund agreements unique to each Local were to survive the
merger intact.  See id.

        Upon our de novo review, we again see no error in the
district court's thorough analysis and legal conclusions.  See
Simas v. Quaker Fabric Corp. of Fall River, 6 F.3d 849, 855 (1st
Cir. 1993) (explaining that when an entity "assumes a liability
that would otherwise be borne by the employer[,]" it is acting in

_____

        [13] The relevant paragraph of the Merger Agreement provides
that:

        The parties agree that any labor-management
        trust agreements to which Locals 1575, 1740,
        1901, and 1902 are parties to provide fringe
        benefits, including welfare, pension, and
        vacation benefits shall remain unaltered and
        shall survive the merger.  The merged Local
        1740 may negotiate new agreements in the
        future to provide benefits for the membership
        of the merged local union if it decides to do
        so.

the interests of that employer and therefore an employer under
ERISA); see also J. Supor & Son Trucking & Rigging Co. v. Trucking
Emps. of N. Jersey Welfare Fund, 30 F.4th 179, 181-82 (3d Cir.
2022) (collecting cases) (reasoning that that an employer under
ERISA and the MPPAA is an entity "obligat[ed] to pay into a
pension, either as a direct employer or on behalf of one").[14]
Accordingly, we find that Local 1740 assumed Local 1575's
liabilities to the Pension Fund when they merged, and that Local
1740 is therefore liable for Local 1575's withdrawal liability and
delinquent contributions to the Pension Fund.[15]

---

[14] Our case is also blessed with an arbitration imbroglio
which we dispose of handily.  Local 1740 says the court "erred
when it held that Local 1740 waived its ability to contest the
withdrawal liability amount by not timely initiating arbitration."
In doing so, it merely reiterates its arguments that Local 1740
was not an employer under ERISA and the MPPAA because the merger
never occurred.  But Local 1740 does not attack the district
court's untimeliness rationale, and because Local 1740 fails to
point us to any overlooked material fact or misapplication of law,
upon our de novo review, we similarly conclude that Local 1740 has
waived any arbitration challenge for lack of developed
argumentation.  See, e.g., United States v. Zannino, 895 F.2d 1,
17 (1st Cir. 1990).

[15] Local 1740 advanced a separate argument maintaining it was
not liable to the Pension Fund under the alter-ego doctrine, a
theory advanced by the Board in its summary judgment motion and
adopted by the court.  That is so because the alter-ego factors
were not met here, and the district court erred when it held to
the contrary.  The court's ruling was "without any valid factual,
evidentiary, or legal basis to support such [a] mistaken
conclusion."  However, because we agree with the district court's
finding that the two Locals merged, we need not address this
alternative finding.

**B.   Attorney's Fees**

Rehashing its no-merger theme, Local 1740 says the court erred when it held that it must pay attorney's fees to the Board because no merger means it is not liable for Local 1575's debts to the Pension Fund.  Having rejected, as the district court did, the premise of this argument, we move on.

Alternatively, Local 1740 offers a different reason for why the award of attorney's fees was either completely unwarranted or, at best, clearly excessive.  As the argument goes, the court allowed the Board's attorneys a second bite at the apple when it ordered the Board to supplement its damages memoranda with a more detailed itemization of its fees and expenses.  In so doing says Local 1740, "[the Board] was allowed to effectively circumvent proper and timely compliance with the applicable legal requirement for requesting attorney's fees and costs."  As such, says Local 1740, the Board's "request for attorney's fees should have been denied altogether considering that it was most certainly not 'in reasonable compliance with judicial pronouncements.'"  But should we find an award appropriate, it insists we apply an additional global reduction of no less than 20 percent for the Board's failure to differentiate between "core" and "non-core" work.

Unlike the de novo treatment we afforded Local 1740's summary judgment arguments above, we employ an abuse of discretion standard here.  See <u>Rojas-Buscaglia</u> v. <u>Taburno-Vasarhelyi</u>, 897

F.3d 15, 24 (1st Cir. 2018).  To prevail, Local 1740 must convince us that the district court "committed a meaningful error in judgment." Lussier v. Runyon, 50 F.3d 1103, 1111 (1st Cir. 1995) (quotation marks omitted).  Upon review, we espy no abuse of discretion.  In determining attorney's fees, we've held that "[t]he court must secure from the attorneys a full and specific accounting of their time; bills which simply list a certain number of hours and lack such important specifics as dates and the nature of the work performed during the hour or hours in question should be refused." King v. Greenblatt, 560 F.2d 1024, 1027 (1st Cir. 1977).  Notwithstanding Local 1740's argument, it has pointed us to no authority indicating that the court's order requesting supplemental information was unreasonable or impermissible.  And the cases Local 1740 do cite are of no help to it because, as the Board correctly notes, they "involve instances where claimants failed to follow the appropriate procedures in submitting a fee request, not where, as here, a claimant makes an appropriate request, and the court simply asks for additional detail." See Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 956 (1st Cir. 1984); Lipsett v. Blanco, 975 F.2d 934, 937–38 (1st Cir. 1992).

Turning to Local 1740's second argument that the court's award of attorney's fees was excessive, again, we detect no abuse of discretion in the court's handling of the fee request.  In addition to reducing the attorneys' rates to those of Puerto Rico,

rather than San Francisco (where the Board's attorneys are located), it also reduced the attorneys' hourly rates by 5 percent uniformly and reduced the originally requested fees by 43 percent. See Bd. of Trs., 2022 WL 4591843, at *6-8.  From our vantage point, and to repeat, the court's order, including this aspect of it, was thoughtful, well-formulated, and comprehensive.  The court correctly applied the law to the facts and thoroughly explained its rationale.  We detect no error.

With that said, and in light of the district court's well-reasoned opinion, no more is needed.  We affirm.

## FINAL THOUGHTS

All that said, we **affirm**.  Costs to Appellee.